Good morning, Your Honors. May it please the Court, Brianna Fuller on behalf of Keshawn Morris. I intend to reserve two minutes of my time for rebuttal. From start to finish in this case, officers used measures that were simply inconsistent with the purpose of the Terry stop and with the purpose of the Terry frisk. For that reason, we ask the Court to reverse the denial of the suppression motion. I want to start with the scope of the collective knowledge doctrine, which we do believe the Court needs to reach in this case, because the police officers did believe that the call was anonymous. That's clear from the record in three places. The first, Officer Seames, who wrote the initial police report, who was involved in the initial stop, said that he believed the call was anonymous, that he was basing his actions on the belief that the call was anonymous. Second, Officer Gonzalez, who submitted the declaration in this case, listed the facts that he believed supported reasonable suspicion, and conspicuously absent from that list is the fact that they knew the name of the caller. Finally, in the last CAD display before officers had Mr. Morris on the ground under arrest, or we contend under arrest, the RP status continues to state that the call is anonymous. And indeed, it's not clear that that last CAD report was even received by the officers on the scene. And the CAD report shows that immediately after it says anonymous with the redacted items, the next entry, which is ten seconds later, shows that the officers are already on the scene. It's not clear that they received that last, the redacted. Sotomayor, assuming that the call was thought by the officers to be anonymous. It was a 9-11 call. The individual who called said that he had just seen the gun, and that the person who showed him the gun, whom he identified pretty accurately in terms of what he looked like and what he was wearing and what he was carrying, was walking away up, I've now forgotten the street, 16th or something like, whatever it was. He was walking up a particular street. And sure enough, when the officers get there, somebody looking exactly like that is walking away, carrying the igloo. And isn't that a sufficient degree of reliability to act on? Because it had just happened and happened to the caller. Your Honor, I still believe the facts are closer to jail in that circumstance than they are to Terry Crespo. If it was an anonymous call that reported general criminality as opposed to a threat, as was the case in Terry Crespo, then I believe the facts are much closer to the facts of jail, and the court should, and the result here should be the same, unless the collective knowledge doctrine applies. The collective knowledge doctrine, I'll move on unless the court had further points. Okay. The court should not apply collective knowledge doctrine to the 911 operator. 911 operators are conduits of information and are no better than the information that they provide to the officers on the ground. It's the officer on the ground who must make sensitive decisions about whether to continue to investigate, whether to conduct a Terry stop, or whether there's sufficient information to arrest. Because the officer is the one to be making that decision, they should receive as much information as possible and should be judged based on the information they possess at the time they make the decision. The government says that it's okay in this case because the 911 operator didn't order the police officers to arrest or to detain Mr. Morris. I think that's beside the point because if the collective knowledge doctrine does apply to 911 operators, then there would be nothing that would preclude a 911 operator from simply saying, I think there's enough. Go ahead and arrest the person. Go ahead and stop the person. Cologne, the Second Circuit case, which excludes 911 operators from the scope of collective knowledge, better reflects the roles and the expertise and the training of 911 operators and police officers. And I believe it should be followed in this case. As far as the scope of the Terry frisk, this Court has never sanctioned opening a closed container in a case not involving exigent circumstances and concerns for officer safety, and it should not do so here. Terry frisks are designed to ensure that peace officers have the opportunity to safely pursue their suspicions and dispel or confirm those suspicions. Once officers had frisked Mr. Morris, once they had him on the ground in handcuffs and separated him from the cooler, they had the time and space to conduct the investigation they needed to do. The case, the long case, the other cases cited by the government in this Court, all involved cases where the individual was, did still present a danger to the police officers precisely because they weren't handcuffed, precisely because they weren't on the ground. What should they have done at that point? They should have used the tools that are, that the police officers during a Terry stop have, asked questions, asked for consent. In this case, we know that the eyewitness was feet away from the scene and could have been brought to say, yes, that is the person I saw, and this is what I, this is what I witnessed. Or, no, that isn't the right person. There's just a lot of people with coolers. Or, you know, I made that up because I was mad at Mr. Morris or something to that  The thing that strikes me here is that this is unlike some of our cases where the, it is believed that the suspect has drugs. It's Delgado and Delviso. Here, they believe reasonably that he has a weapon. But no, it's not on him. That leaves the igloo. So why isn't the fact that they suspected him of having a gun the dispositive inquiry here? Your Honor, I do think that it's certainly a relevant consideration that he had a gun, but at the point that the most extreme tactics were used against him, he was not, did he present an actual threat of gaining access to the cooler? Perhaps not instantly, but if they let him go, he was leaving with a gun, with what they believe to be a gun in the container. Your Honor, that's a point brought up by Long, and respectfully, in the Long case, that was an actual concern. It wasn't a mere hypothetical. In Long, it says if we don't let them search the car, he's going to be allowed to get back in the car at some point, and indeed, he may be allowed to get back in the car before the stop is over. That wasn't a hypothetical in Long because he was actively trying to get back in the car to get his registration at the point where they saw the knife sitting on the floorboard. So I think, and Long is very clear that not every stop will involve this kind of extensive terry frisk, that the mere fact that he stopped doesn't automatically allow the officers to search the car. It's a case-by-case basis. In this case, there was no reasonable chance that Mr. Morris was going to get access to that car. And so they know that. So he's going to have to go, and he's going to walk out with what they reasonably believe to be a gun. Your Honor, and this Court in Flippen said that the mere chance that the officer wouldn't be able to get back in the car at some point, and indeed, he may be allowed to get back in the car before the stop is over. Again, I think that at the point that he opened the cooler, it wasn't yet an exigency. There were tools that were at his disposal to investigate the case, again, particularly here where the eyewitness was feet away and could have been brought to the scene. Actually, speaking of when he opened the container, we don't know that, do we? It's not entirely clear at what point in the sequence he opened the cooler. It is clear that Officer Gonzalez, who was the one who actually opened the cooler or, I'm sorry, it appears that Officer Gonzalez was one of the last to the scene. He, in his declaration, says that as he was pulling up toward Baseline Drive, he saw other units approaching the black male. It also is clear that from the CAD that there was about a minute and a half that elapsed between the time they were on the scene and when the cooler, it appears that when the cooler was opened. It suggests that they, it wasn't simply at the very first moment that the cooler was opened. With that, I'd like to reserve the last question. Let me ask you a quick question. Sure. The motion to suppress was directed at what? It was directed at the gun and at the statements that were made. It was not directed at things that were seized later from him? If the Court's referring to the marijuana? Yes. Okay. I think that would also be a fruit because he was only under arrest. In your motion to suppress, did you refer solely to the gun? I don't remember off the top of my head. I believe that everything was covered, but certainly the marijuana and the statements would also be a fruit. Thank you. Okay. Thank you. Mr. Kerman. Good morning, Your Honors. David Kerman on behalf of the United States. May it please the Court. I'd first like to address the opening of the cooler, which is directed at many of the Court's questions. And I think the Court's question of what was the officer supposed to do at that point hits the nail on the head. They are faced here with a suspect pursuant to a Terry stop. They had a reasonable belief that he was carrying a gun based on a call from a non-anonymous party who had seen the gun firsthand. And they had the individual detained, and they had patted him down, and there was no gun on his person. Would the police have known what the 911 operator knew at that point, that the anonymous caller had said that there had been a gang confrontation, had been a fight out in front of the liquor store? Your Honor, the police officers at the scene did not know those additional facts. What they did know is that there was a man reported with a gun walking down the street, the description of the man, and that the individual had shown a reporting party the gun. The officers on the scene did not know the additional facts about the gangs and the fight that had occurred earlier. So they were faced with an individual they had patted down, and there was no gun on this person, and they didn't have probable cause to arrest him. So there was one of two options. There was to open up the cooler to confirm or to not confirm whether there was a gun in there, or there was to release the suspect, put him with the cooler, at which time the officers would be placing themselves in potential danger by giving him the cooler or the gun, in addition to the public, as well as the individual the person had sought. You know, a lot of that makes a lot of common sense. But one of the problems here, I don't think I've ever seen this, is that there's no evidence by the police officers of what they did, when they did it, or why. Your Honor, based on the record and based on the CAD report specifically, it's true there's no record on that, and there was no facts or testimony taken on this oppression. So both parties had submitted it. What do we do with that? Your Honor, I believe that the court takes the declarations as they were. They were not challenged. But there's nothing to say that the officers acted out of their own or other people's safety. There's nothing to say when they opened the cooler or why. There's nothing to say. Well, there's nothing to say anything. Your Honor, that's true, and I think that the inquiry here is whether or not they acted reasonably based on the facts in the record as the record is, which is unchallenged. Well, but the stuff you were just talking about isn't in the record. So the only thing that is in the record is that they got an anonymous tip that there was a guy who was dressed like Morris turned out to be dressed pretty much, carrying the cooler, walking down a particular street, who had just shown a gun to the caller. That's true, Your Honor. I mean, the gun could have been, you know, an antique that he was collecting. It could have been a squirt gun. It could have been, and that's why the officers were entitled to conduct a Terry stop and quickly confirm or dispel whether or not there was a gun. I don't doubt that they were entitled to stop him. But the question here is, what were they then entitled to do? They stop him with guns drawn. They get him down on the ground. They cuff him, at which point he can't do anything. So he can't reach for the gun anymore, assuming that there's a gun in the cooler. But we don't know why the officers did it, and we don't know when they did it. Your Honor, we don't know exactly, and the record is not clear on the precise timing of all this, but it is clear that this all happened over a relatively short amount of time, and it appears that the cooler was opened shortly after the defendant was initially detained. And that's based on Officer Gonzalez's declaration, as well as the timing that's in the CAD display, which is communicated to and from the officers. And with respect to the initial detention, the government submits that, based on the facts of this case and based on the heightened danger or their specific report of a gun, they were entitled to use somewhat aggressive tactics to ensure their safety, and that's what they did here. They didn't say that. How can we assume that? Your Honor. And equally assume that they just were intemperate and had the guy completely secure and decided to see what was in his cooler. That's true, Your Honor. The government submitted declarations in this case in support of its motion to suppress, and the defendant at the time could have cross-examined the witness on his declaration, and they declined to do that. The declaration does not say they acted out of safety reasons or when they acted, unless I'm missing it. No, Your Honor is correct. The declaration doesn't say why or when they acted, but based on the facts of this case and the undisputed facts in this case, it's reasonable to infer that they were acting based on the report that they received, which reported that a man was carrying a gun down the street. And they also acted quickly to confirm or deny whether or not this was the individual who was carrying the gun. Oddly enough, they didn't ask. Your Honor, that's correct. They did not ask him. With respect to the issue of reasonable suspicion, the government submits that this case is more like Terry Crispo and less like jail, regardless of whether the court applies the collective knowledge doctrine. The officers on the ground knew the location of the call, famed liquors, the business location, the phone number, and the name of the caller, and the caller reported personally observing the gun, which forms reasonable suspicion based on this court's authority and Terry Crispo. And, in fact, the reasonable suspicion here is greater than Terry Crispo, because there there were some aspects of the reasonable suspicion that were suspect, such as the name of the defendant was spelled in a weird fashion, as well as the fact that there wasn't a good phone number to call him back and they couldn't confirm the location of the caller. So the reasonable suspicion, based on just the knowledge of the officers in the field, is sufficient here under Terry Crispo. And with respect to the collective knowledge doctrine, the government submits that the knowledge of the operator should be imputed into the officers in the field. The public's interest in a quick response by officers outweighs the need of the officers in the field to cross-examine the operator regarding every fact that they know. And, in fact, it's impractical, and I think the record here establishes all the information that is coming into the operator, and the operator trying their best to distill and communicate that information to the officers in the field so that they could effectively do their job. And with respect to Cologne's point that it shouldn't be imputed because of the operator's lack of police knowledge, the facts are here that the officer was just communicating facts to the officers in the field. Who, what, where. The operator wasn't telling them to make a stop, a Terry stop, or arrest on probable cause, or just to approach them and talk to them. They were communicating facts, and officers, based on their training and their experience, took those facts and did what they deemed appropriate here, which was to stop the person and determine whether or not they had a gun. And so for those reasons, the government believes that the analysis and the basis of Cologne is misplaced. And, in fact, government cited some cases in this circuit where the court has imputed the 911 operator's knowledge, as well as some cases in other circuits as well. Subject to the court's questions, the government would not submit. Okay. Thank you. Since I only have five seconds, I'll just respond more thoroughly to Judge Alarcon's question, which is that at ER 40 we do challenge the admission of all unlawful evidence obtained during the search. And so I agree with you that marijuana isn't specifically suggested therein, but I do think that by implication the court, if we were to get that far, we would certainly be seeking the marijuana case. Thank you, Your Honor. Well, if that would be the matter, just the argument will be submitted. That's it for this day. All rise. J. Viper, Spain will prosecute you even if we don't. You are a war criminal. This court is harboring a war criminal. It's not a good thing. You all shouldn't be practicing these crimes. You're a good person. You should be a good person. Isn't that what you said in the court? Okay. Oh, so you're going to get that down there? Oh, okay. So this guy. Good. All right.
judges: Alarcon, Rymer, Bybee